UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DWIGHT GREGORY SCHINE, | ) | |
| By his next friend Stephen Short, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 15-cv-5870 |
| vs. | ) | |
| | ) | |
| NEW YORK STATE OFFICE FOR PEOPLE WITH | ) | |
| DEVELOPMENTAL DISABILITIES and | ) | |
| KERRY DELANEY, in her official capacity as Acting | ) | |
| Commissioner for the New York State Office for | ) | |
| People With Developmental Disabilities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INTRODUCTION

1.      Title II of the Americans with Disabilities Act ("ADA") prohibits the unjustified

isolation of persons with disabilities, *see* 42 U.S.C. § 12132; *Olmstead v. L.C.*, 527 U.S. 581, 597

(1999), and requires states and other public entities to "administer services, programs, and

activities in the most integrated setting appropriate to the needs of qualified individuals with

disabilities." 28 C.F.R. § 35.130(d).  28 C.F.R. § 35.130(b)(3)(ii) prohibits states and other

public entities from utilizing criteria or methods of administration that "have the purpose or

effect of defeating or substantially impairing accomplishment of objectives of the public entity's

program with respect to individuals with disabilities."  Section 504 of the Rehabilitation Act of

1973 ("Rehabilitation Act") similarly prohibits recipients of federal financial assistance from

discriminating against individuals with disabilities, and requires that they provide services and

supports in the most integrated setting appropriate to the needs of individuals with disabilities.

29 U.S.C. § 794, 45 C.F.R. § 84.

2.      Plaintiff, Dwight Gregory Schine ("Schine") is a fifty-one-year-old man who is developmentally disabled.  He requires care at an Intermediate Care Facility for Intellectual Disabilities ("ICF/IID").

3.      Schine has chosen to live independently in the community rather than in a facility, and he requires services to assist him with many of his activities of daily living.

4.      Defendants NEW YORK STATE OFFICE FOR PEOPLE WITH DEVELOPMENTAL DISABILITIES and KERRY DELANEY, in her official capacity as Acting Commissioner for the New York State Office for People With Developmental Disabilities ("OPWDD") have wrongfully denied Schine the right to allocate his Personal Resource Account ("PRA" or "Budget") to allow him to live in the residential setting he chooses.   Schine is not asking that any additional funds be added to his PRA.  He simply requests that he be allowed to allocate his PRA in a manner that would allow him to live in the least restrictive environment that would promote his best physical and mental health.

5.      Defendants' refusal to allow Schine to allocate his PRA in order to live and receive services in the residential setting of his choice puts him at risk of being institutionalized.  If he remains in his current living situation which requires him to hire and work with Self Hired Community Habilitation Staff and places him in tremendous isolation, Schine is likely to be institutionalized as his current living situation is causing him to decompensate mentally.

6.       Defendants' refusal to allow Schine to allocate his PRA to allow him to live in the least restrictive environment is in violation of the American With Disabilities Act and federal regulations.

**JURISDICTION**

2

7.      This Court has jurisdiction of this action under title II of the ADA, 42 U.S.C.

§ 12133, Section 504 of the Rehabilitation Act and its implementing regulations, 29 U.S.C. §

794a, 28 U.S.C. § 1343(a)(3) and (4), and 28 U.S.C. §§ 1331 and 1345. The Court may grant the

relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, given that a

substantial part of the acts and omissions giving rise to this action occurred in the Eastern

District of New York.  28 U.S.C. § 1391(b).

## PARTIES

9.      Plaintiff is the Dwight Gregory Schine, a person suffering from an intellectual

and developmental disability.

10.     Defendant New York State Office For People With Developmental Disabilities

("OPWDD") is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and is,

therefore, subject to title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing

regulations, 28 C.F.R. Part 35.   Defendant Kerry Delaney is the Acting Commissioner of the

OPWDD and is sued in her official capacity only.

11.     At all times relevant to this action, the State of New York has been a "recipient"

of "federal financial assistance," including Medicaid funds, and is, therefore, subject to the

Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, 34 C.F.R. Part 104.

12.     Stephen Short is the next friend of Schine, and authorized to bring this lawsuit

on behalf of Schine pursuant to FRCP 17(c)(2).

## STATUTORY AND REGULATORY BACKGROUND

13.     Congress enacted the ADA in 1990 "to provide a clear and comprehensive

national mandate for the elimination of discrimination against individuals with disabilities[.]"  42

U.S.C. § 12101(b)(1).  It found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]"  42 U.S.C. § 12101(a)(2).

14.     For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

15.     Congress directed the Attorney General to issue regulations implementing title II of the ADA.  42 U.S.C. § 12134.  The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible[.]"  28 C.F.R. § 35.130(d), App. B at 673 (2011).

16.     Regulations implementing title II of the ADA further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3); *accord* 45 C.F.R. § 84.4(b)(4) (Rehabilitation Act).

17.     Discrimination on the basis of disability is also prohibited by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a): "No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity…."

18.     The Rehabilitation Act's implementing regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d); *see also* 45 C.F.R. § 84.4.

19.     In *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999), the Supreme Court held that title II prohibits the unjustified segregation of individuals with disabilities.  Under *Olmstead*, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected persons do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities.  *Id*. at 607.

## FACTUAL ALLEGATIONS

20.     Schine is a fifty-one (51) year old man who is intellectually and developmentally disabled.  Schine suffers from chronic and persistent psychiatric symptoms since childhood.  He has severe and persistent mental illness side by side with judgment and intellectual deficiencies.

21.     Schine has difficulty sustaining relationships.  He evidences a severely negative/obsessive internal thought processes which results in highly inappropriate behavior that he seems to have no control over, e.g. making multiple telephone calls to family, friends and professionals to counter feelings of loneliness and to diffuse anxiety.

22.    His need for social contact seems insatiable, yet he experiences tremendous anxiety and stress when he is required to be in close contact with others.

23.    New York State has declared that Schine's intellectual and developmental disabilities require him to receive care twenty-four hours a day, seven days a week at an Intermediate Care Facility for Individuals with Intellectual and Developmental Disabilities ("ICF/IID").

24.    Pursuant to law, a person with disabilities can chose to live in an institution or receive care in the home or community of said person's choice.

25.    Schine has elected his right to live in the community and has chosen home and community based services ("HCBS") , thereby waiving his right to live in an institution.

26.    HCBS is configured to provide individuals with alternative ways to self-direct choices, resources and authority over their services.

27.    Schine currently lives in an extremely small and claustrophobic studio apartment.   He is forced to spend most of his time in his studio apartment either suffering from the anxiety caused by being in close and intimate situations with his paid staff upon whom he is completely reliant for all shopping, cooking, cleaning, transportation, and personal needs, or he is completely alone and isolated in the studio apartment, which triggers his fear of abandonment. His mental health is seriously deteriorating as the result of his isolated living conditions.

28.    Schine has been diagnosed with a personality disorder that precludes him from developing intimate relationships and close ties with other people, especially when the companions are paid workers, also known as Self Hired Community Habilitation Staff.

29.     Either Schine is totally alone and suffers panic feelings and fear of abandonment, or he must contend with hired staff at his side continuously in his claustrophobic studio apartment which triggers his fear of intimacy.

30.     Due to his diagnosed personality disorder and developmental/intellectual disability, Schine becomes belligerent and oppositional in close sustained contact with paid staff persons.

31.     Schine receives mental health treatment four days per week to cope with the stress of getting along with staff and/or being totally alone.

32.     Schine's mental illness and physical illnesses related to the stress of interacting with the constant Paid Community Habilitation Staff or having to be completely alone to avoid the intimacy is worsening.

33.     Unless the stress and anxiety of this unworkable living situation is remedied, Schine will continue to worsen to the point where he will not be able to live in the community and will have to be institutionalized.

34.     Schine's developmental disability requires that he receive round the clock, but at the same time prevents him from developing working relationships with his providers.  He is constantly in conflict with his providers.

35.     As the result of his developmental disability, Schine has fired at least seventeen staff and professionals in the past twelve months -- people who had been hired to assist him with these Community Habilitation Services.

36.     Schine has no family support.

37.     A friend, Stephen Short ("Short"), has spent countless hours assisting Schine in hiring and supervising Schine's Habilitation Services without any compensation. Because of the

tremendous turnover of Schine's Habilitation Staff, caused by Schine's developmental disability, if Short were not able to assist Schine, Schine would be institutionalized.

38.     Schine should not be required to depend on the goodwill of a friend to keep him out of  an institution.

39.     Schine has located an independent living facility known as the Atria Enriched Housing Program ("the Atria"), located at 51 Great Neck Road, Great Neck, New York, which would provide him with the support he needs without having to manage and contend with Self Hired Community Habilitation Staff, as the Atria provides many of the services provided by Schine's Self Hired Community Habilitation Staff.

40.     The Atria provides housing accommodations and basic services to its residents. The Atria will cook and serve all of Schine's meals, will do his laundry, arrange for the bulk of his transportation, and provide social activities for him.

41.      The residents have the right to use the Atria's general purpose rooms, such as lounges, craft room, library, private dining rooms and the wellness center.

42.     The Atria provides congregate dining, which includes the preparation and service of three healthy meals a day as well as nutritious snacks.  Schine would no longer need to hire Self Hired Community Habilitation Staff to shop and cook for him.  Schine would dine in a communal dining hall and attend social activities provided by the Atria, which would alleviate his isolation and the stress of his inability to work successfully with his Self Hired Community Habilitation Staff.  This stress and isolation exacerbate his developmental disability.

43.     There are aides in attendance at the Atria on a twenty-four hour basis to provide supervision services and personal assistance when required with the activities of daily living.

8

44.     The Atria provides housekeeping services, and laundry services, which includes linen changes once a week and towel changes twice a week.

45.     The Atria provides organized and diverse supervised activities and all basic recreational supplies.

46.     The Atria staff assists the residents in obtaining access to the resident's necessary health or mental health services and will arrange for transportation to the residents' medical services.

47.     The Atria staff assists with medication management for the residents.

48.     The Atria is a venue that offers companionship 24/7. Schine would be able to live alone in health and safety, without having paid staff in his living environment all the time.

49.     The Atria's living quarters would be larger which would make it more comfortable when support staff needs to come in and out to assist him with daily living.

50.     The Atria would allow him to receive the living assistance he needs, the companionship he needs, as well as the privacy he needs, without triggering the anxiety and stress of having to be in such close contact with paid staff for such long periods of time.

51.     The Atria environment would also provide Schine with the necessary socialization and opportunity for non-paid companionship and friendship with the other residents and the Atria staff.  The Atria staff provides a non-intrusive, watchful eye on the residents and would assist Schine with the activities of daily living that Schine requires, without having to have  Self Hired Community Habilitation Staff intruding in his personal living space which causes Schine severe anxiety and results in him being in tremendous conflict with his paid staff.

52.     Unless the stress of having to hire and work with Self Hired Community Habilitation Staff and the isolation of living in a small studio apartment is greatly reduced, Schine will decompensate to the point of having to be institutionalized.

53.     Schine has requested that he combine the resources allotted to him for Self Hired Community Habilitation Staff and other socializing and transportation needs and add that to his current allotment for housing, and pay that amount to live at the Atria.

54.     OPWDD has approved $54,474 in funds for Schine to hire "providers" or Community Habilitation Staff to assist him thirty (30) hours a week with tasks such as shopping, food preparation, laundry and travel; $4,000 in funds for cabs and trains; $1,750 for "support brokerage" to assist him in arranging for and paying his community staff; $2,000 for a "board stipend"; and $13,596 as a housing subsidy.

55.     OPWDD has determined that the Atria is an acceptable setting for continued enrollment in the HCBS waiver program and is an appropriate living situation for Schine.

56.     On or about October 24, 2014, Schine submitted a PRA or Budget, requesting that he be permitted to allocate funds which OPWDD had approved for Self Hired Community Habilitation Staff, a broker, transportation, social activities and household goods, and his housing stipend, be paid to the Atria.   The Atria would provide all of these services, along with his housing and meals, for an annual cost of $61,452, eliminating the need for Schine to work with and hire Self Hired Community Habilitation Staff, and pay for laundry services, transportation and social activities.   The total amount Schine requested in his Budget was $92,938, which included $61,452 to be paid to the Atria.

57.     While OPWDD approved an overall budget of $92,938, it refused to permit Schine to direct his funds to pay to live at the Atria in the Independent Living model, and receive all of the services provided by the Atria.

58.     OPWDD stated that it would only pay a housing subsidy of $1,339 per month, or $16,068 per year, and that it would not pay the Atria cost $5,121 per month, or $61,452 per year.

59.     This is an arbitrary limitation on a housing subsidy and does not take into consideration what is the best setting for Plaintiff.

60.     Additionally, the $5,121 per month is not just a "housing" cost.  It includes most of the services Schine needs which are normally provided by Self Hired Habilitation Staff. By obtaining these services through the Atria, Schine would reduce his Self Hired Community Habilitation Staff cost and Support Brokerage cost from $56,294 to $26,130, and would reduce the funds allotted for socialization such as classes, a consultant, a gym, mileage and miscellaneous household from $20,018 to $2,356.  The Atria would be supplying these services, and would receive payment for supplying these services rather than Schine having to have paid staff  in essence in his living space for more than eighty (80) hours a week.

61.     Schine's request to live at the Atria is a reasonable accommodation, which does not require a new program or an increase in Schine's PRA, and which only requires a change in OPWDD's internal policy of limiting "housing subsidies" without regard to the disabled person's needs and rights.

62.     This housing subsidy cap imposed by OPWDD prevents Schine from allocating his resources in the best manner possible which would allow him to remain in the community in the least restrictive setting.  Given Schine's prior behaviors and inability to work with

Community Hired Habitation Staff and his increased isolation, it is almost certain that Shine will need to be placed in an institution unless his accommodations are improved.

63.     OPWDD fails to take into account that the monthly cost to live at the Atria includes the services that Schine would otherwise have to pay to Self Hired Community Habilitation Staff.

64.     While the budget noted the expense of living at the Atria as a "housing subsidy," it is much more than that, as the Atria would be providing Schine with the Community Habilitation he needs, without Schine having to hire and direct staff to assist him with shopping, cooking, cleaning, laundry, transportation, and social activities.

65.     OPWDD has denied Schine the right to direct his resources based upon his own choices, and has denied him his right to a person-centered service plan based upon his individual needs, preferences and residential settings.

66.     OPWDD's denial of Schine's right to direct his resources as he chooses denies him the right to privacy, dignity and respect, and puts him at great  risk of institutionalization.  Unless Schine is able to reduce his isolation and eliminate the stress of failed relationships with his Habilitation Staff, Schine will be forced to live in an Intermediate Care Facility for Intellectual Disabilities ("ICF/IID"), a segregated setting that conflicts with, *inter alia,* the integration mandate of title II of the ADA and the *Olmstead Act.*

67.     Upon information and belief, it currently it costs New York State approximately $450,000 per year per occupant for a person to reside in a New York State operated Intermediate Care Facility for Individuals with Intellectual and Developmental Disabilities.

68.     Upon information and belief, currently it costs New York State approximately $225,000 per year per occupant for  a person to reside in an Agency Group Home and attend a Day Habilitation.

69.     Allowing Schine to allocate his PRA to live at the Atria is much less expensive than the cost of accommodating Schine in an ICF/IID or an Agency Group Home.

70.     OPWDD has already approved a PRA of $92,938.   However, if Schine is not permitted to change his living situation to accommodate his needs, he is at great risk of institutionalization. The Self-Hired Community Habilitation Staff is not meeting Schine's social, mental, emotional needs.  He needs to be in a more social environment, without the stress of being in tremendous conflict with his Habilitation staff and without having to hire, direct, and supervise Habilitation Staff.  By living in the Atria, he will be more self-directed, and be able to live in more dignity, and in less isolation, within the same PRA already approved by OPWDD.

71.     By limiting Schine's "housing subsidy" and refusing to let him allocate his resources how he sees fit, OPWDD is limiting the type of dwelling, living situation and neighborhood he can live in.

72.     OPWDD is segregating Schine to live with people who receive a similar housing subsidy.

73.     Schine is entitled to live in the most integrated setting just like individuals without disabilities.  OPWDD is violating the enforcement of the integration mandate of title II of the ADA and the *Olmstead Act*  by refusing to allow Schine to allocate his resources so he may live in the Atria in an Independent Living Setting.

74.     OPWDD is denying Schine the ability to reside in the residence and setting of his choice.

75.      Schine is requesting a reasonable accommodation.

76.      The delay in approving Schine's requested accommodation is causing

irreparable harm to his health and is causing Schine to seriously contemplate institutionalization.

## COUNT I

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

77.      Plaintiff repeats and realleges and incorporates by reference the allegations set

forth above.

78.      Defendant is a public entity subject to title II of the ADA.  42 U.S.C. §

12131(1).

79.      Defendant violates the ADA by administering its mental health service system

in a manner that denies Plaintiff, a person with a developmental and intellectual disability, at risk

of entry into adult care homes the opportunity to receive services in the most integrated setting

appropriate to his needs.

80.      Plaintiff, as a person with a developmental and intellectual disability at risk of

entry into an ICF/IID is a person covered by title II of the ADA, and he is qualified to receive

services in a more integrated setting.  42 U.S.C. §§ 12102, 12131(2).

81.      Providing services to Plaintiff in a more integrated settings can be accomplished

with reasonable modifications to the Defendants' programs and services.

82.      Defendant's actions constitute discrimination in violation of title II of the ADA,

42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Part 35.

## COUNT II

## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

83.    Plaintiff repeats, realleges and incorporates by reference the allegations set forth above.

84.    The State of New York, which is a recipient of federal financial assistance, discriminates against "qualified individual[s] with a disability" within the meaning of Section 504 of the Rehabilitation Act by administering programs and services for individuals with mental illness in a manner that denies individuals the opportunity to receive services in the most integrated setting appropriate to their needs.  29 U.S.C. § 794; 45 C.F.R. § 84.4.

85.    Plaintiff, as a person with a developmental and intellectual disability, is covered by Section 504 of the Rehabilitation Act, and he is qualified to receive services in a more integrated setting and is entitled to choose where he lives and direct his resources as he sees fit.

86.    Providing services to Residents and persons with mental illness at risk of entry into an ICF/IID in more integrated settings can be accomplished with reasonable modifications to the Defendants' programs and services.

87.    Defendant's actions constitute discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, 45 C.F.R. § 84.4.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

A.    Grant judgment in favor of Plaintiff on its Complaint and declare that Defendants have violated title II of the ADA, 42 U.S.C. § 12131 *et seq*. and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

B.    Enjoin Defendants from:

1.      failing to provide appropriate, integrated community services and support to Plaintiff, an individual with an intellectual and developmental disability at risk of unnecessary segregation in an ICF/IID;

2.      discriminating against Plaintiff, an individual with an intellectual and developmental disability at risk of unnecessary segregation in adult care homes by failing to provide services and supports in the most integrated setting appropriate to his needs;

3.      denying Plaintiff the right to allocate his Personal Resource Account to live at the Atria;

C.      Issue a declaratory judgment declaring that Defendants have violated title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by failing to make reasonable modifications to services, programs, and supports for Plaintiff, an individual with intellectual and developmental disabilities at risk of unnecessary segregation in an ICF/IID to enable him to receive services in the most integrated setting appropriate to his needs;

D.      Issue declaratory judgment declaring that Defendants are to pay for the cost of Plaintiff to live at the Atria;

E.      Order such other appropriate relief as the interests of justice may require, including awarding reasonable attorney's fees, litigation expenses, and costs, pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794a(b).


October        , 2015                          Respectfully submitted,


                                               _____
                                               GAIL M. BLASIE, ESQ.(GB1148)
                                               Attorney for Plaintiff
                                               585 Stewart Avenue, Suite 544
                                               Garden City, New York  11530

(516) 457-9169
Fax:  (516) 739-6643
blaze@cal.net