**FILED**
**CLERK**

11:32 am, May 20, 2019

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
DWIGHT GREGORY SCHINE, by his next
friend Stephen Short,

                               Plaintiff,

             v.

NEW YORK STATE OFFICE FOR PEOPLE WITH
DEVELOPMENTAL DISABILITIES and KERRY
DELANEY, in her official capacity as Acting
Commissioner for the New York State Office for
People With Developmental Disabilities,

                               Defendants.
--------------------------------------------------------------X

**MEMORANDUM & ORDER**
15-CV-5870 (SJF)(SIL)

FEUERSTEIN, District Judge:

   Plaintiff  Dwight Gregory Schine ("Plaintiff" or "Schine") commenced this action by his

next friend, Stephen Short, against the New York State Office for People with Developmental

Disabilities ("OPWDD") and that agency's acting commissioner Kerry Delaney (collectively

"Defendants") alleging violations of Title II of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12131 and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §

794a.  Currently before the Court is Defendants' motion for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure.  Motion, Docket Entry ("DE") [49].  Plaintiff has

opposed the motion.  For the reasons set forth below, the motion is granted.

## I.  BACKGROUND

### A.  Factual Background[1]

   Plaintiff, who is approximately 54 years of age, suffers from intellectual and

developmental disabilities.  Since childhood, he has suffered from chronic and persistent

---

[1] The facts, which are undisputed unless otherwise indicated, are are drawn from Defendants' Local Civil
Rule 56.1 Statement of Undisputed Facts ("Def. 56.1 Stmt"), DE [50-1]; the Declaration of Katherine

psychiatric symptoms, and has been diagnosed by his licensed clinical psychologist with various cognitive and neuropsychological deficits as well as "OCD, Asperger's Syndrome, . . . Borderline Personality Disorder, ADHD, Depression, Anxiety and PTSD." Complaint ("Compl.") ¶86. Given his developmental disabilities, Schine is qualified to receive full-time care in an Intermediate Care Facility ("ICF"). Bishop Decl. ¶2; LoPresti Decl. ¶8. Instead, however, he lives in the community and receives supportive services funded by both the state and federal government. OPWDD's denial of Schine's request to reallocate this funding to make a change in his living arrangements is the subject of this litigation.

1. Self-Direction Program for Qualified Individuals

Qualified individuals may receive care at an ICF, or may alternatively receive benefits through the Home and Community Based Services ("HCBS") waiver program which "permits a State to furnish an array of home and community-based services that assist Medicaid beneficiaries to live in the community and avoid institutionalization." Application for a § 1915(c) Home and Community-Based Services Waiver ("HCBS Waiver Appl."), Pl. Ex. 10. "The waiver is set forth in an agreement between OPWDD and the federal government, in which the federal government approves OPWDD's use of federal money for which it would not otherwise reimburse OPWDD, and in exchange, OPWDD is subject to certain federal standards

---

Bishop in Support of Defendants' Summary Judgment Motion ("Bishop Decl."), DE [50-2]; Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 Stmt"), DE [53-1]; and the Declarations in Opposition to Defendants' Motion for Summary Judgment of Gail M. Blasie ("Blasie Decl."), DE [53-5], Stephen Short ("Short Decl."), DE [53-4], Karen Lopresti ("Lopresti Decl."), DE [53-6], and Dr. David O. Belser ("Belser Decl."), DE [53-7]. Only those facts that are material to the disposition of the motion are set forth herein. *See Zann Kwan v. Andalex Grp.,* 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the enter of summary judgment'" (brackets in original) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).

to which it would not otherwise be subjected." Bishop Decl. at ¶3. OPWDD is an operating agency for the waiver program in New York state.

The HCBS waiver includes an option to "self-direct" certain services, giving individuals the flexibility to choose a mix of supports and services that are "provided outside the requirements found in a formalized program model" and allowing them "to receive services more aligned to their individual needs." Bishop Decl. at ¶¶ 3, 4.[2] There are two self-direction options including the one utilized by Schine, which is called *Self-Direction with Budget and Employer Authority.* Bishop Decl. at ¶4. Under this option, the client is allotted a budget or Personal Resource Account ("PRA") that specifies the total amount of money for him to use for the defined available service options within the self-directed plan. The PRA is established by OPWDD and allocates funds for services based upon a needs assessment of the individual. *Id.* Each service is capped and cannot exceed an amount set by the state, and the service "must be compliant with the service definition which is stated within the approved HCBS waiver, and the cost cannot exceed the service rate that a provider would get paid and which is also defined in the HCBS waiver." *Id.* ¶5. Although the State receives reimbursement for specific waiver services, the federal government does not reimburse the State for room and board expenditures. *Id.* (citing 42 U.S.C. § 1396n(c)(1); 42 CFR §441.310).

Under this model, the service recipient does not receive budget monies directly, but rather the "only way to obtain the resources identified in an individual budget is through the delivery and then billing for the compliant service." Bishop Decl. ¶5. Each budgeted service is billed separately "to allow clients to customize their services by determining which specific

---

[2]In March 2018, there were approximately 90,000 people receiving HCBS waiver services in the OPWDD system, of which approximately 9,000 choose to self-direct their services. Bishop Decl. ¶6.

services they either want or do not want, in a manner that best meets their needs." Def. 56.1 Stmt ¶25; *but see* Pl. 56.1 Stmt ¶25 (noting that this format "is often unworkable and does not always meet the clients' need").

### 2. Schine's Participation in a Self-Directed Program

Schine has elected to receive services via an HCBS waiver, and since 2011, has lived in the community in a studio apartment located at 60 Knightsbridge Road, Great Neck, New York, and receives 54 hours per week of paid Community Habilitation staff support. LoPresti Decl. ¶8. OPWDD pays most of Plaintiff's expenses, including housing and mental health treatments, pursuant to his "Personal Resource Account Self-Direction Budget" approved by the OPWDD. Schine also receives Social Security Disability Income. An Individualized Service Plan ("ISP") prepared by a service coordinator and dated June 25, 2015 indicates that Schine visits friends, has dinner with one friend once a week, goes to movies at least once a week, visits the gym and the library, and volunteers at a local senior center. ISP, DE [50-9].

Declarations submitted in opposition to this motion assert that the ISP is outdated and paint a different picture of Schine's living conditions. According to his clinical social worker, he currently lives "in an extremely small and claustrophobic studio apartment," and relies completely upon the Community Habilitation staff for shopping, cooking, cleaning, transportation, and personal needs. LoPresti Decl. ¶11. She states that the Community Habilitation staff are the only people he sees or with whom he socializes. *Id.* ¶40. He cannot tolerate isolation, but close proximity to support staff "often triggers anxiety and aggression." *Id.* ¶11. In the year preceding the filing of this complaint in October 2015, Schine fired seventeen (17) staff and professionals. Schine's social worker and psychologist both opine that

Schine is at a great risk of being institutionalized if his current situation remains unchanged. LoPresti Decl. ¶41; Belser Decl. ¶16.

### 3.  Schine's Budget Reallocation Proposal

In 2014, Schine sought to change his living arrangement and submitted a proposed budget to OPWDD that included an increased housing subsidy so that he could live at the Atria, an assisted living facility located near the his current apartment.[3]  That facility, located at 51 Great Neck Road, Great Neck, New York, has one hundred and forty-four (144) apartments, including studios, and one- and two-bedroom units, and offers four living options:  independent living, advanced and supportive living, memory care, and short-term stays.  The Atria is licensed by the New York State Department of Health as an Enriched Housing Program ("EHP") and classified as a Private Proprietary Home for Adults.  An EHP is an adult care facility that provides "long-term residential care to five or more adults, primarily persons sixty-five years of age or older, in community-integrated settings" and that provide room, board, housekeeping, personal care, and supervision.  N.Y. SOCIAL SERVICES LAW § 2(28).  The Atria provides services via a "bundled service model" by which it charges a single, all-inclusive fee for services including, *inter alia,* room, board, meals, and support services.  It does not provide a separate breakdown of the charges by discrete category or service.  Atria does not accept Medicaid funding.

In 2014, Schine submitted a budget to OPWDD requesting a reallocation of the funds in his PRA so that he could pay the cost of living at the Atria, which was at the time, $5,121 per

---

[3] A second proposed budget was also submitted in which Plaintiff sought funding to live not at the Atria, but instead in a larger private residence with two live-in caregivers.  To achieve this, Plaintiff sought to reallocate funds in excess of the $27,700 maximum annual amount for live-in caregivers.  The OPWDD rejected this proposal for exceeding the maximum allowable amount for that service.  Plaintiff does not challenge that decision in the instant case.

month or $61,452 annually. [4]   In 2014, Schine's PRA was $92,938, which included: a housing

subsidy of $1,333 per month or $13,596 for the year; $2,000 as a board stipend; $54,574 for

Community Habilitation staff/care providers thirty hours per week; $4,000 for transportation;

$1,750 for support brokerage; $3,784 for classes; $9,934 for a consultant four hours per week;

and $3,300 for miscellaneous household costs, gym, and activity fees.  Schine's proposed budget

would reallocate $47,856 of the non-housing funds to the housing amount so that it would

increase to $61,452.  The proposed increase in housing funding requested by Plaintiff would be

accomplished by reallocating funds designated for waiver services such as Community

Habilitation and Individual Directed Goods and Services (classes, consulting fees, gym,

miscellaneous household, and transportation) into the housing component of his budget so that

he could afford to live at the Atria.  Bishop Decl. ¶10.

OPWDD rejected this requested budget since the reallocation would result in a housing

subsidy exceeding the maximum allowable amount of $16,068 per year or $1,399 per month.

Def. 56.1 Stmt ¶60.  Plaintiff notes that he sought only to reallocate state funds, and not federal

Medicaid funds, but admits that the housing subsidy "would be greater than the arbitrary amount

fixed by Defendants."  Pl. 56.1 Stmt ¶60.   Schine requested and received a hearing before an

Administrative Law Judge ("ALJ").  The ALJ made findings of fact including, *inter alia,* that

"HCBS funding is prohibited from being used for an individual's room and board cost other than

that allowed by guidelines.  OPWDD housing subsidies are limited based on the state Division of

Community Renewal (DHCR/HUD) standards," and that the maximum allowable housing

---

[4]While there have been increases in both Atria's monthly fees and Schine's budgets as set in his PRAs,
the parties' arguments remain essentially the same despite these changes.  To avoid confusion, the Court
will discuss the his budget amounts and Atria's costs for 2014 as discussed in the parties' Rule 56.1
Statements and Plaintiff's Ex. 6.

subsidy for Schine is $1,399.00 per month.   Decision After Fair Hearing dated 6/19/15 ("ALJ Dec.") at 2, DE [50-14].  Acknowledging that the purpose of the HCBS waiver services program is to allow Schine "the choice to live in the community and avoid an institution," the ALJ found that "the program regulations do not state that [Schine] is entitled to unlimited budgets and or unrestricted choices," and upheld OPWDD's determination.  *Id.* at 12.

Schine suggests that he will be institutionalized if forced to remain in his current situation.  His social worker and psychologist conclude that "[l]iving in the Atria would be a step away from institutionalization, and a step towards living in the least segregated setting possible." LoPresti Decl. ¶ 42; Belser Decl., ¶25.  Although Schine specifically wishes to live at the Atria, his social worker has stated that Schine's condition will continue to worsen "if he is not permitted to reside in a community *like the Atria."*  LoPresti Decl. ¶28 (emphasis supplied).

## B.  Procedural History

Plaintiff filed his complaint on October 13, 2015, claiming that Defendants' failure to provide him with a reasonable accommodation violates Title II of the ADA and Section 504 of the Rehabilitation Act.  Defendants' motion to dismiss the complaint was denied, discovery was conducted, and the instant motion for summary judgment filed.

Defendants raise several arguments in support of their motion, including that Schine has not established that he needs an accommodation, that the accommodation he seeks is not reasonable, that placement in the Atria would be more restrictive than his current housing, and that granting Schine the relief he seeks would fundamentally alter OPWDD's program.  They also challenge Short's capacity to bring this action as Schine's "next friend."

## II. LEGAL STANDARD

### A. Summary Judgment

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting FED. R. CIV. P. 56(a)). In deciding a motion for summary judgment, "the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."(quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996))).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies its initial burden, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554,

558 (2d Cir. 2012) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). All facts under consideration must be directly supported by admissible evidence. *See* FED. R. CIV. P. 56(c).

The party opposing summary judgment must, however, "do more than simply show that there is some metaphysical doubt as to the material facts" but rather "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original) (internal quotation marks omitted); *see also Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (noting that "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact" (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252) (alterations in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

Moreover, "[w]here the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986) (holding that summary judgment is appropriate when the non-moving party has failed to make a sufficient showing on an essential element for which it bears the burden of proof).

**B. ADA and Rehabilitation Act Claims**

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  As both statutes "impose identical requirements," the claims may be considered "in tandem."  *Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir. 1999); *see also Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003) (while there are subtle differences, "unless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically").

To establish a violation under either the ADA or Section 504, a plaintiff must establish that (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability. *See B.C. v. Mt. Vernon Sch. Dist.,* 837 F.3d 152, 158 (2d Cir. 2016); *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).   There is no dispute that Schine is a qualified individual with a disability.

Both the ADA and Section 504 contain an "integration mandate" requiring public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of the qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* 28 C.F.R. § 41.51(d) (setting forth integration mandate under the Rehabilitation Act); *Joseph S. v. Hogan,* 561 F. Supp. 2d 280, 289-90 (E.D.N.Y. 2008) (finding that "failure to provide placement in a setting that enables disabled individuals to interact with non-disabled persons to the fullest extent possible violates the ADA's integration mandate"). A disabled individual must be placed in a community setting rather than an institution if: "[1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587, 119 S. Ct. 2176, -- L. Ed. 2d -- (1999). "*Olmstead* unquestionably holds that the 'unjustified institutional isolation of persons with disabilities' is, in and of itself, a prohibited 'form of discrimination.'" *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016) (quoting *Olmstead*, 527 U.S. at 600); *see also Frank v. Sachem Sch. Dist.,* 84 F. Supp. 3d 172, 185 (E.D.N.Y. 2015) (noting that "one way for a plaintiff [to] show discrimination is through violation of the integration mandate"). An individual need not be institutionalized to state a claimed violation of the integration mandate, but rather may "may state a valid claim for disability discrimination by demonstrating that the defendant's actions pose a serious risk of institutionalization." *Davis*, 821 F.3d at 263.

While the State has the obligation "to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the

basis of disability," no modification is required if the public entity establishes that the

accommodation or modification "would fundamentally alter the nature of the service, program,

or activity." 28 C.F.R. § 35.130 (b)(7). Whether a proposed alternative to a state's plan results

in a fundamental alteration of that plan is a "fact-specific, case-by-case inquiry." *Mary Jo C. v.

New York State & Local Ret. Sys.,* 707 F.3d 144, 165 (2d Cir. 2013). "The contention that a

requested accommodation constitutes a fundamental alteration or would impose an undue

hardship is an affirmative defense." *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F.

Supp. 2d 588, 657 (S.D.N.Y. 2013).

## III.  DISCUSSION

### A.  Standing

As a threshold matter, Defendants suggest that Short does not have standing to bring this

action as Schine's "next friend" and urge the Court to "determine this threshold jurisdictional

issue." Def. Mem. at 13. To establish next-friend standing, Short must "provide an adequate

explanation – such as inaccessibility, mental incompetence, or other disability – why the real

party in interest cannot appear on his own behalf to prosecute the action" and also show that he is

"truly dedicated to the best interests of the person on whose behalf he seeks to litigate."

*Whitmore v. Arkansas,* 495 U.S. 149, 163-64, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990).

In his Declaration, which is uncontroverted, Short states that Schine is unable "to bring or

participate in this litigation on his own" and that Schine had asked Short to do so on his behalf.

Short Decl. ¶9. Schine's clinical psychologist and social worker have acknowledged Schine's

intellectual and developmental disabilities and have concluded that he is "completely unable to

litigate this case on his own." Belser Decl. ¶ 8; LoPresti Decl. ¶ 9. As to his dedication to

Schine's best interests, Short describes various actions he has taken on Schine's behalf over

recent years such as filing his OPWDD paperwork, Short Decl. ¶ 5, taking him to medical appointments, *id.* ¶ 6, and acting as his non-legal representative for medical purposes. *Id.* ¶ 8. In addition to these administrative duties, Short has provided Schine with an iPhone as part of his own family plan and at no cost to Schine, *id.* ¶ 6, he spends time with Schine, and Schine has spent holidays with Short's family. *Id.* ¶ 10. Thus, Short has demonstrated dedication to the particularized interests of Schine. *Cf. Fenstermaker v. Obama,* 354 F. App'x 452, 456 (2d Cir. 2009) (plaintiff purporting to act as "next friend" to detainees held at Guantanamo Bay, Cuba, failed to establish that he was truly dedicated to their best interests). Defendants state that discovery "revealed that Mr. Short merely 'self-appointed' himself as Mr. Schine's 'next friend,'" Def. Mem. at 12, but have cited no evidence to support this statement. Short has established that he may act as "next friend" for Schine.

**B. Subject Matter Jurisdiction**

The OPWDD argues that this Court lacks subject matter jurisdiction because the issue presented is not ripe for adjudication.[5] Specifically, it notes that Schine has provided no proof (1) that he has ever applied to Atria to be a resident, (2) that there is a vacancy available for him at that facility, or (3) that a physician has certified that he is suited for residency there. As such, it argues, the issue of his placement in Atria is speculative and not ripe for resolution. Plaintiff has provided two additional declarations from Short and LoPresti pertaining to Schine's possible placement at the Atria. *See* Declaration of Stephen Short ("2nd Short Decl."), DE [58-2]; Declaration of Karen LoPresti ("2nd LoPresti Decl."), DE [58-3].[6] LoPresti, citing her treatment

---

[5] OPWDD raised this argument for the first time in its Reply papers. Plaintiff has moved for leave to file a sur-reply to address this argument. *See* Motion, DE [58]. That motion is granted; the Court has considered Plaintiff's additional submissions with limits as discussed, *infra*.

[6] The second Short Declaration is of limited value as it is replete with hearsay statements concerning his conversations with Atria personnel, such as his report that the Atria's *prior* director "indicated there

13

of Schine and her familiarity with the Atria's residents including at least one client, provides her professional opinion that Schine "is a suitable candidate for the Atria" and that there is nothing in his medical history that would prevent his admission. 2nd LoPresti Decl. ¶¶ 7, 8. As to Schine's failure to apply to the Atria for placement, Short states that Atria "would not process Mr. Schine's application unless Mr. Schine confirmed that he was able to pay to live there." 2nd Short Decl. ¶ 8. As such, Schine is placed in the position of not being able to secure a decision from the Atria unless or until the OPWDD approves the necessary funds.

"To the extent that issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' [a] conclusion that the [complaining party] will sustain immediate injury . . . and that such injury would be redressed by the relief requested would appear to satisfy this requirement." *Duke Power Co. v. Carolina Envtl. Study Grp.,* 438 U.S. 59, 81, 98 S. Ct. 2620, 57 L. Ed.2d 595 (1978) (internal citation and quotation marks omitted). However, "*absolute certainty of injury is not required for a case to be constitutionally ripe.*" *Simmonds v. Immigration & Naturalization Serv.,* 326 F.3d 351, 358 (2d Cir. 2003) (emphasis in original).

The issue of whether the Atria would ultimately accept Schine as a resident remains unresolved; that issue, however, is not the one raised by Schine for review. Whether OPWDD must accommodate Schine's request to reallocate his funding is a distinct question from whether he will ultimately be able to use that funding for the purpose he intends. Although funds are not disbursed until billed, OPWDD does not cite evidence of a requirement that housing and other items on an individual's budget must be secured prior to approval of that budget. The OPWDD has determined that it will not reallocate Schine's funding in the way he sought, rendering him

---

would be no problem admitting Mr. Schine," 2nd Short Decl. ¶3, as well as conjecture, and speculation regarding the suitability of Schine's placement at the Atria. *See, e.g., id.* ¶6 (declaring that "[b]ased on Mr. Schine's medical history, there is no doubt that a doctor would sign" the form approving his admission to the Atria).

unable to apply to the Atria. Schine's claims that this decision violates his rights are ripe for adjudication.

## C. ADA and Rehabilitation Act Claims

"A plaintiff may base [his] discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis*, 821 F.3d at 260. Schine claims that he has been discriminated against by OPWDD when it failed to approve reallocation of his funding as he sought in his proposed budget, a proposal he claims constitutes a reasonable accommodation.

### 1. Reasonable accommodation and risk of institutionalization

Defendants make several arguments in support of their motion for summary judgment. First, they contend that Schine has not established that he needs any accommodation because he already functions in a community setting. While Defendants cite to testimony regarding Schine's community activities such as going to the movies or the gym and visiting with friends, Plaintiff provides evidence that Schine's situation has worsened and that he no longer participates in those activities. At the very least, there is a material issue of fact as to whether Schine requires an accommodation.

Schine also claims that the OPWDD's refusal to approve his proposed budget violates the integration mandate, arguing that his deteriorating condition, which has resulted in his increased isolation from others, can and should be remedied by his placement at the Atria so that he will be able to interact with non-disabled persons. He contends that he faces a serious risk of institutionalization if he is forced to remain in his current circumstances. To accomplish the move to the Atria, Schine has asked the State to reallocate his funding to aggregate the monies into the "housing" category so that he can afford to live there. Failure of the State to allow this

reasonable modification in the face of his risk of institutionalization, he argues, violates the integration mandate.

There are varied characterizations of both Schine's current condition and the risk that he may need to be institutionalized. Schine's social worker and psychologist opine that his current living situation is putting him at risk of institutionalization and that a move to the Atria would improve his condition and constitute a step away from an institution. OPWDD claims this is mere speculation, noting that he has lived in the community for numerous years and has not demonstrated that without this modification, he will end up in an institution. Weighing this conflicting evidence "to determine whether Plaintiff faces 'a *serious* risk of institutionalization,' *Davis*, 821 F.3d at 263 (emphasis added), lies outside the Court's purview at the summary judgment stage." *Woods v. Tompkins Cty.,* No. 516CV0007, 2019 WL 1409979, at *9 (N.D.N.Y. Mar. 28, 2019). Accordingly, Defendants' motion for summary judgment on this basis is denied.

### 2.  Fundamental alteration defense

 Pursuant to the fundamental alteration defense, "a defendant need not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity.' " *Powell v. Nat'l Bd. of Medical Examiners*, 364 F.3d 79, 88 (2d Cir. 2004) (quoting 28 C.F.R. § 35.130(b)(7)); *see also Olmstead,* 527 U.S. at 603 (noting that "[t]he reasonable-modifications regulation speaks of 'reasonable modifications' to avoid discrimination, and allows States to resist modifications that entail a 'fundamental alteration' of the States' services and programs" (internal citation omitted)). Even assuming *arguendo* that the material issues of fact are resolved in Schine's favor and his request was for a reasonable

modification, the requested modification would fundamentally alter the nature of the program, and thus Defendants prevail on their motion on this basis.

Plaintiff's proposal is straightforward – he asks that the OPWDD utilize only state funds, redesignated solely as "housing" costs, to allow him to live at the Atria. If OPWDD has committed an aggregate dollar amount toward his care, why can't it just reallocate the total amount to "housing" so that he can live at the Atria? The State's overall contribution would be equal to its share under his current program (and lower than the cost of institutionalization), and since no federal funds are used, the arrangement would not run afoul of Medicaid requirements. Plaintiff essentially characterizes his proposal as merely a bookkeeping exercise with an easy resolution.

Schine's proposal, while facially appealing, does not stand up to closer scrutiny as it fails to comport with the HSCB waiver program as currently constituted, and its approval would require the OPWDD to administer his program in a fundamentally different way. Specifically, his proposal (1) requires changes to the basic funding and reimbursement aspects of the program, and (2) contemplates a program different from the self-direction model integral to the HSCB waiver program. While the Court is sympathetic to Schine's situation and does not question his advocates' sincerely held belief that the Atria would improve his condition, the accommodation he seeks fundamentally alters the self-directed, HSBS waiver program in which he participates.

*a.  Alteration of program funding*

The self-directed program in which Schine currently participates authorizes medical assistance reimbursement for certain waiver services "provided to individuals with developmental disabilities living in the community, including case management, respite, habilitation, and environmental modifications." *Martin v. Wing*, No. 95-CV-1274, 1996 WL

191974, at *1 (N.D.N.Y. Apr. 16, 1996). An individual is not simply assigned a fungible pot of money to be spent as that individual sees fit. A needs assessment is conducted, and funds are allocated to meet the specific requirements of each individual participant. Each service is subject to a budget cap and other program requirements. "[F]or example, the Community Habilitation service cannot exceed a specified amount based on a state defined methodology, the services must be compliant with the service definition which is stated within the approved HCBS waiver, and the cost cannot exceed the service rate that a provider would get paid and which is also defined in the HCBS waiver." Bishop Decl. ¶5; *see also* Bishop Dep. at 105, Pl. Ex. 11 ("The PRA is an established rate for self-directing services. And it is at that rate that we have the partnership through the waiver with the federal government . . ."). As currently proposed, the housing component would exceed the maximum allowable amount. Reallocating other waiver services into housing would circumvent the approved methodologies central to the HCBS waiver program.

Moreover, the Atria's bundled billing system deprives OPWDD of the ability to conduct meaningful oversight of the costs incurred. Without knowing what portion of the monthly payment is allocated to, for example, programs, the OPWDD cannot determine whether the spending is within allowable amounts. When the Atria's monthly rate increases and Schine requests additional funds to match those increases, OPWDD would be unable to effectively assess which services were increased and whether the increase was warranted or was within program parameters.[7]

Although Schine contends that his proposal is valid because he is not seeking to use any federal funds, the relationship between the state and federal government is integral to the HCBS

---

[7] Plaintiff already acknowledges that the annual cost of living at the Atria increased from $61,452 in 2014 to $74,400 in 2017. Pl. 56.1 Stmt ¶51.

waiver program, which is built around the ability of the state to receive reimbursement for certain medical assistance expenditures. His argument that he merely wishes to spend the funds allocated by the State in a different way refuses to acknowledge that the self-directed option is part of the HCBS waiver program and as such, the budgetary rules of the program are intertwined with the service components. Under the self-directed program, the state and federal entities evenly split the costs for specific waiver services, not including housing. If Atria did bill by line item, OPWDD would be able to seek federal reimbursement for qualified expenditures. As Atria does not itemize its services, its billing for would not comport with the federal and state requirements for reimbursement of HCBS waiver services. Under Schine's proposal, the State's portion of the waiver services would be reallocated as a housing cost not reimbursable under Medicaid. Therefore, Schine is asking the State to forego its ability to seek federal reimbursement of waiver services by moving those dollars into housing, a non-Medicaid benefit.

Furthermore, if OPWDD were to agree to Schine's proposal, it would have to make that arrangement available to other qualified program participants. According to OPWDD, "[a]ccessing the federal share of service costs by using compliant service methodologies allows the state to maximize revenue and serve more people in need." Bishop Decl. ¶15. As more people elect this new option, the revenue stream would be increasingly impacted. Without addressing the loss of federal reimbursement monies, Plaintiff suggests that allowing him and other similarly situated people to "access state funds to pay for services like the Atria," Pl Stmt. ¶73, would save the State money because the cost of placement at the Atria, is far less than the cost of placement in a state-run ICF. What he proposes is not a modification of the self-directed option of the HCBS waiver program, but rather a separate program wherein the State allows

qualified individuals to utilize only State funds to seek placement in a private assisted living facility such as the Atria.

The parties disagree as to whether Schine's proposal would violate federal regulations. Plaintiff argues that there is no risk of violating Medicaid regulations because he is asking OPWDD to reallocate his state funds and use only those monies to pay the Atria. OPWDD points to other investigations undertaken by the federal government and contends that granting Schine's request could result in negative consequences to the state programs. Neither argument is supported by direct evidence, and the investigations conducted previously are not on point. As this issue appears to have not been raised with the federal program yet, concerns about would the federal overseers might or might not do are necessarily speculative. As Schine's self-directed program proposal would still operate within HCBS waiver program, OPWDD's fear of a negative consequence should Medicaid audit the HCBS waiver program and take issue with Schine's arrangement, is not unreasonable. Resolution of this issue in one party's favor is unnecessary, however, as the proposal fundamentally alters the program for the reasons stated above.

Schine acknowledges that reallocating funds into housing would cause him to exceed the housing cap, but contends that the cap is arbitrary. He provides neither legal nor factual support for this conclusory statement. He also argues that OPWDD can make exceptions to the housing subsidy cap and has done so in other cases and, indeed, there is some evidence in the record to support that broad proposition. Michelle Giuliano, Director of Self-Directed Services, testified that exceptions could be granted in "extraordinary circumstances" such as "[f]ire, flood, natural disaster, tragedy." Giuliano Dep. at 37. Solutions crafted to meet an extraordinary circumstance would be "temporary." *Id.* at 71. Giuliano was only aware of one such exception granted and

that involved a readjustment of waiver services to allow a teenage participant to live at home. *Id.* at 72, 75. In contrast, Schine seeks an ongoing change to his PRA that would permit him to exceed the housing cap indefinitely by transforming waiver services into housing costs. There is no evidence to suggest that an exception comparable to that sought here has ever been considered or granted by OPWDD.

### b. *Alteration of self-direction principles*

OPWDD is not required to provide a new benefit as there is a distinction between "(i) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits." *Wright v. Giuliani,* 230 F.3d 543, 548 (2d Cir. 2000). Schine is not seeking a modification to assure his access to an existing program, but rather is asking for a new benefit by reallocating the state's funding to allow him to live in an environment that is, in some respects, antithetical to the tenets of the self-directed HCBS waiver program.

The OPWDD's HCBS waiver is designed "to provide participants with a life that offers person-centered and individualized alternatives and to enable people to lead more typical lives in their communities" by offering "more choice, control and community membership through currently approved waiver services and service modifications." HCBS Waiver Appl. The self-directed model allows the individual to live independently in the community with supportive services and to make specific decisions about the services he wishes to receive and who will provide them. *See id.* (waiver participants in conjunction with state authorities and other actors "create a person-centered service environment that is innovative and focused on community resources and self-direction principles").

21

As a participant in the self-directed HCBS waiver program, Schine is currently responsible for making various choices including, *inter alia,* selecting his own programs, making his own meal determinations, and hiring and firing supportive staff.  At the Atria, he would be abdicating all or part of those decisions to the Atria and its staff.  As the bulk of his budget for programs would be reallocated to housing, he would be limited to programs and activities selected and provided by the Atria.  In addition, meals would be limited and offered at specific times.  Although there may be some flexibility within the meal hours allotted and Schine may have access to a "snack bar," he would have far less choice than he currently enjoys.  He would also have no input whatsoever on Atria's staff.  Contrary to the goals of the waiver program, Schine would be responsible for fewer and fewer self-directed choices.  Indeed, his psychologist has suggested that relief from decision making is one of the attractive parts of living at Atria.  Belser Decl. ¶26 (citing the need to reduce "stress of having to hire and work with paid Community Habilitation Staff").

Schine suggests that, consistent with a self-directed program, he is "choosing" to live at the Atria.  His choices are not unlimited and are constrained by the program in which he participates and thus his decisions must be made within the program's parameters.   The choice he is making here is simply one not contemplated by the waiver program structure and therefore granting his proposal would necessitate a fundamental alteration to the existing program.

## IV.  CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment, DE [49] is granted in its entirety.  The Clerk of the Court shall enter judgment accordingly and close this case.

**SO ORDERED**.

 /s/
Sandra J. Feuerstein
United States District Judge

Dated: May 20, 2019
       Central Islip, New York

.